867 F.2d 1381
 57 USLW 2593
 FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Counter-Defendant-Appellee,
v.
Nicholas H. MORLEY, Interterra, Inc., Regina Interiors,
Incorporated, City National Bank of Miami, a national bank
as Trustee of a land trust known on the Trustee's record as
Trust No. 5003138, Defendants-Counterclaim-Plaintiffs-
Third-Party Plaintiffs-Appellants,
Continental Illinois National Bank and Trust Company of
Chicago, a national banking association,
Third-Party Defendant,
Villa Regina Association, Inc., Defendant.
 No. 88-6012.
 United States Court of Appeals,
Eleventh Circuit.
 March 16, 1989.
 
 Dennis Alan Richard, Richard and Richard, Miami, Fla., Bruce Rogow, Ft. Lauderdale, Fla., for defendants-counter-claim-plaintiffs-third-party plaintiffs-appellants.
 Richard F. Levy, P.C., Kirkland & Ellis, Chicago, Ill., for plaintiff-counter-defendant-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before RONEY, Chief Judge, HATCHETT, Circuit Judge, and HENDERSON, Senior Circuit Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 Nicholas H. Morley, Interterra, Inc., and Regina Interiors, Inc. (Morley) seek review of the district court's dismissal of their counterclaim which challenged the Federal Deposit Insurance Corporation's (FDIC) financial assistance program to Continental Illinois National Bank and Trust Company of Chicago (Continental). The district court dismissed Morley's counterclaim for lack of standing, granted summary judgment against Morley, and awarded the FDIC $38,787,277.83 under notes and mortgages. We affirm.
 
 FACTS
 
 2
 In April, 1981, Continental loaned Morley approximately $37,000,000. Morley borrowed this money to finance a land purchase and to construct a condominium project in Miami, Florida. Morley failed to repay the loan on November 30, 1982, the original due date. Continental granted Morley several maturity date extensions on which Morley also failed to repay the loan. After Morley failed to repay the loan in August, 1986, Continental refused to further extend the maturity date. Of the original amount borrowed, an outstanding cipal of $30,942,242.73 remained. Based on Morley's failure to repay the loan nearly four years after the original due date, Continental declared the notes and mortgages in default.
 
 PROCEDURAL HISTORY
 
 3
 During the lending relationship with Morley, Continental experienced severe financial difficulties. The failure of another bank caused Continental problems with earnings, asset quality, and funding. To remedy the severe liquidity crisis which threatened to close Continental, in July, 1984 the FDIC adopted a financial assistance program to provide $4.5 billion in permanent assistance to Continental.
 
 
 4
 The FDIC devised a three-part plan to implement the $4.5 billion financial assistance program. Initially, the FDIC purchased specific troubled loans from Continental Illinois. The loans represented $4.2 billion of legal claims which Continental had previously written down to $3 billion. The FDIC assumed $2 billion of Continental's debt to the Chicago Federal Reserve Bank in exchange for these loans.
 
 
 5
 To implement the plan's second part, Continental simultaneously issued a three-year note to the FDIC for $1.5 billion. The FDIC agreed to accept $1.5 billion of additional Continental loans during the following three-year period as satisfaction for this note. In exchange for the $1.5 billion note, the FDIC assumed an additional $1.5 billion of debt which Continental owed to the Chicago Federal Reserve Bank.
 
 
 6
 The plan's third part involved an indirect capital infusion into Continental. To increase Continental's capital, the FDIC purchased $1 billion of preferred stock from Continental's holding company, Continental Illinois Corporation (CIC). More specifically, the FDIC purchased two issues of CIC non-voting preferred stock, requiring CIC to directly invest the proceeds into Continental.[1] To carry out the plan, CIC immediately invested the $1 billion in Continental.
 
 
 7
 In February, 1987, Continental transferred Morley's loan to the FDIC. The FDIC acquired Morley's loan under the assistance program's second part, the extended loan acquisition program.
 
 
 8
 In March, 1987, the FDIC sued Morley in the Southern District of Florida to collect the outstanding borrowed amount and to foreclose on the property used as collateral for the loans. Morley did not dispute his failure to repay the outstanding balance which exceeded $30 million. Despite this admission, Morley asserted several affirmative defenses to contest the FDIC's foreclosure action. The affirmative defenses include: estoppel, waiver, laches, fraud, unclean hands, illegal transfer, commercial unreasonableness, breach of fiduciary duty, breach of obligation of good faith and fair dealing, and duress. The defenses alleged additional agreements which the loan documents did not reflect. The defenses also alleged that Continental fraudulently and deceptively undermined Morley's business venture.[2] In addition to asserting the affirmative defenses, Morley counterclaimed for the court to declare the FDIC's acquisition of his loan invalid, void, and voidable because the FDIC did not conduct its financial assistance program under section 1823(c). See 12 U.S.C. Sec. 1823(c) (Supp.1988).[3]
 
 
 9
 On September 3, 1987, the FDIC moved to strike Morley's affirmative defenses and to dismiss Morley's counterclaim. The FDIC contended that section 1823(e) barred the affirmative defenses and that Morley did not have standing to contest the Continental assistance program's validity. See 12 U.S.C. Sec. 1823(e) (Supp.1988).[4] Morley conceded that section 1823(e) applied to the loans acquired under the plan's first part because such acquisition complied with section 1823(c). Morley, however, contends that because the FDIC acquired his loan nearly three years after the FDIC implemented the Continental assistance plan, section 1823(e) did not bar his defenses.
 
 
 10
 The district court rejected this contention and concluded that section 1823(e) applied to the subsequently-acquired loans, including Morley's loan. As a result, the court held that section 1823(e) barred Morley from raising the affirmative defenses.[5]
 
 
 11
 The district court also concluded that Morley lacked standing to counterclaim for a declaration that the FDIC did not acquire his loan under a valid section 1823(c) transaction. The court found that Morley failed to satisfy the standing doctrine's "irreducible constitutional requirements." More specifically, the court held that Morley's injury, the loss of his affirmative defenses, was not fairly traceable to the allegedly invalid loan acquisition. Rather, the court concluded that Morley's failure to memorialize the alleged loan agreements in writing caused Morley to lose his defenses.
 
 
 12
 After striking the affirmative defenses and counterclaim, the district court granted summary judgment for the FDIC. The court held that no genuine issue of material fact existed because Morley admitted failing to repay the loans. The court subsequently ordered a foreclosure sale of the property used as collateral for the loan.
 
 CONTENTIONS
 
 13
 Morley contends that the district court erred in concluding that he did not have standing to challenge the statutory basis for the FDIC's acquisition of his loan from Continental. Morley contends that he satisfied the constitutional elements for ing: (1) the loss of affirmative defenses constituted a cognizable injury; (2) the loss of the defenses was fairly traceable to the challenged financial assistance program; and (3) a favorable decision would redress his injury by invalidating the section 1823(e) bar to his defenses.
 
 
 14
 Morley contends that section 1823(e) does not bar his defenses because the FDIC did not acquire his loan from Continental under section 1823(c). According to Morley, the Continental assistance program did not comply with section 1823(c) because the FDIC gave money to CIC; section 1823(c) only allows the FDIC to directly assist "an insured bank" or indirectly assist an insured bank by assisting a merger or acquisition partner or such partner's holding company. See 12 U.S.C. Sec. 1823(c)(1) and (2).
 
 
 15
 Finally, Morley contends that federal common law does not provide an alternative ground for affirming the district court's decision. Although Morley recognizes that the federal common law protects the FDIC in a traditional purchase and assumption transaction, Morley contends that such protection does not extend to the Continental assistance program.
 
 
 16
 The FDIC contends that we should reject Morley's appeal for three reasons. First, the FDIC argues that it unquestionably purchased Morley's loan under section 1823(c) because it implemented the Continental assistance program within the broad discretion which 1823(c) grants it. The FDIC notes that several federal courts have held that the FDIC conducted the Continental assistance program under section 1823(c).
 
 
 17
 Second, the FDIC argues that Morley lacks standing to challenge the Continental assistance program's validity because Morley does not satisfy the standing doctrine's constitutional elements: (1) the loss of defenses does not constitute a judicially cognizable injury; (2) even if a cognizable injury exists, the assistance program did not cause it; and (3) a favorable court ruling will not redress the injury. The FDIC also argues that prudential considerations compel the court to reject Morley's standing argument because Morley, a borrower, falls outside the zone of interests which section 1823 protects.
 
 
 18
 Finally, even if section 1823(e) does not apply, the FDIC argues that federal common law protects the FDIC from Morley's affirmative defenses. According to the FDIC, the courts have consistently barred debtors' defenses under a federal policy of protecting the FDIC from alleged secret agreements between a failing bank and the bank's debtor.
 
 ISSUE
 
 19
 The sole issue is: Whether Morley has standing to challenge the Continental financial assistance program's validity under section 1823(c).
 
 DISCUSSION
 
 20
 Article III of the United States Constitution limits the federal courts power to resolving "cases" or "controversies." See Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982); Saladin v. Milledgeville, 812 F.2d 687, 690 (11th Cir.1987). To assure that the federal courts do not violate this restriction, we require a litigant to have standing to assert a claim in a federal court. Valley Forge Christian College, 454 U.S. at 471, 102 S.Ct. at 757, 70 L.Ed.2d at 708; Saladin, 812 F.2d at 690. A litigant has standing only when the litigant's complaint demonstrates that the party has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions...." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); see Saladin, 812 F.2d at 690.
 
 
 21
 While the standing doctrine remains an elusive concept, the Supreme Court has created a useful framework for resolving standing disputes. Under this framework, the standing doctrine has two components: the "irreducible" constitutional requirements and the prudential considerations. Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 758, 70 L.Ed.2d at 709; Saladin, 812 F.2d at 690. To satisfy the standing doctrine's constitutional component, a litigant must demonstrate three elements. First, the party must have suffered an actual injury or demonstrate the imminence of such injury. Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 758, 70 L.Ed.2d at 709; Saladin, 812 F.2d at 690. Second, the injury "must be fairly traceable to the challenged conduct." Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 758. Finally, the party must demonstrate that a favorable decision will likely redress the injury. Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 758.
 
 
 22
 Beyond satisfying these constitutional requirements, a party must show that prudential considerations do not favor judicial restraint from hearing such action. The Court recognizes three factors which discourage judicial action despite a party's satisfaction of the constitutional elements: (1) assertion of a third party's rights rather than individual legal rights; (2) allegation of a generalized grievance rather than an injury peculiar to such litigant; or (3) assertion of an injury outside the statute's or constitutional provision's zone of interests. Valley Forge Christian College, 454 U.S. at 474-75, 102 S.Ct. at 759-60, 70 L.Ed.2d at 711; Saladin, 812 F.2d at 690.
 
 
 23
 Before turning to the standing issue, we note that both parties' arguments on the merits have no relevance to the standing determination. Morley quotes several documents which allegedly demonstrate that the FDIC did not comply with section 1823. Similarly, the FDIC urges that its actions did not deviate from the wide discretionary boundaries which section 1823 gives it. This court and the Supreme Court have previously noted that we analyze standing questions on a complaint's allegations without considering the litigant's likelihood of success on the merits. See Saladin, 812 F.2d at 690 n. 4 (standing determination is a preliminary jurisdictional matter which a court must resolve without considering the likelihood of success on the merits); Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204-05, 45 L.Ed.2d 343 (1975). Therefore, we do not address the arguments on the merits.[6]
 
 
 24
 A. Failure to Satisfy the Standing Doctrine's Constitutional Elements
 
 
 25
 Morley contends that he satisfies the three constitutional standing requirements and that the prudential considerations do not support judicial abstention. In contrast, the FDIC contends that Morley does not satisfy any constitutional element and that the prudential considerations support judicial restraint. The district court only addressed the fairly traceable standing element, concluding that Morley's injury did not result from the challenged conduct. Because the FDIC contends that Morley fails to satisfy all the elements of standing, we address all the requirements. See Saladin, 812 F.2d at 690-91 n. 5 (court focused on actual injury requirement where the district court did not address other elements, the appellees did not contest the other requirements and the record clearly showed that the plaintiff satisfied the other requirements).
 
 1. Actual or Imminent Injury
 
 26
 Morley contends that he suffered an actual injury; the application of section 1823(e) caused the loss of several affirmative defenses. The FDIC contends that Morley has not suffered a judicially cognizable injury. The district court implicitly assumed that an injury existed because it addressed the fairly traceable element. We agree with the FDIC that Morley has not alleged a judicially cognizable injury.
 
 
 27
 To have standing, a litigant must have suffered a "distinct and palpable injury" rather than an "abstract" or "conjectural" injury. Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556, 569-70, reh'g denied, 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984); Saladin, 812 F.2d at 691. Although the litigant must show a concrete injury, such individual need not satisfy a quantitative threshold. See Saladin, 812 F.2d at 691 (no minimum quantitative limit exists). Rather, we must focus on the injury's qualitative nature.
 
 
 28
 Morley contends that the loss of defenses satisfies the concreteness standard. The one court which addressed this exact issue reached a contrary conclusion. See FDIC v. W.H. Venture, 607 F.Supp. 473, 475-76 (E.D.Pa.1985). The W.H. Venture court noted that the loss of defenses was not a sufficient legal harm to support standing. W.H. Venture, 607 F.Supp. at 476. We find the W.H. Venture court's analysis persuasive.
 
 
 29
 In W.H. Venture, a debtor wanted to challenge the Continental assistance program's validity. The FDIC had acquired the debtor's loan pursuant to the financial assistance program. The court held that the debtor did not have standing to attack the plan's validity under section 1823. Although not relying on the following statements, the district court clearly expressed its view that the loss of affirmative defenses did not constitute a judicially cognizable harm:
 
 
 30
 Naturally, anytime a party to an action loses a potential defense, they can be said to be harmed. It is not, however, 'harm' in a general sense that the law is concerned with, rather it is a specific legal harm that the court makes cognizance of in its grant of standing.... W.H. Venture has suffered no legal harm by the imposition of section 1823(e).
 
 
 31
 W.H. Venture, 607 F.Supp. at 476.
 
 
 32
 The valid application of a constitutional statute cannot create a cognizable harm. The statute merely serves its purpose, eliminating parties from asserting defenses. Because Morley's alleged harm is the natural consequence of a valid congressional enactment, the loss of his affirmative defenses does not constitute the specific injury necessary to confer Article III standing. See W.H. Venture, 607 F.Supp. at 476 (Congress intended to insulate the FDIC from a debtor's defenses).
 
 
 33
 2. Loss of Defenses Not Fairly Traceable to Challenged Conduct
 
 
 34
 Assuming that Morley's loss of affirmative defenses constitutes a legal harm, Morley contends that the loss of defenses is fairly traceable to the FDIC's acquisition of its loan. Morley argues that he satisfies the fairly traceable prong because "but for" the FDIC's acquisition under section 1823(c) Morley would not have lost his defenses. The FDIC contends that Morley's failure to secure the "secret agreement" in writing caused the harm. The district court concluded that Morley failed to satisfy the fairly traceable requirement. The court held that Morley's failure to comply with section 1823(c) by securing the alleged modifications in writing caused Morley's loss of defenses. We agree with the district court's conclusion.
 
 
 35
 The fairly traceable element explores the causal connection between the challenged conduct and the alleged harm. Allen, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19, 82 L.Ed.2d at 571 n. 19.[7] The essential inquiry for this requirement focuses on whether "the line of causation between the illegal conduct and injury [is] too attenuated[.]" Allen, 468 U.S. at 752, 104 S.Ct. at 3325, 82 L.Ed.2d at 570.
 
 
 36
 Under this analysis, Morley's loss of defenses is not fairly traceable to the assistance program, but rather Morley's injury resulted from his failure to place the alleged modifications in writing. Morley knew of the assistance program since 1984; therefore, he knew that the FDIC could acquire his loan for nearly three years. As a result, Morley had constructive knowledge that if the FDIC acquired his loan, section 1823(e) would bar defenses based on oral agreements. Yet with this knowledge, Morley failed to secure the alleged agreements in writing. While the FDIC acquisition of Morley's loan barred Morley's affirmative defenses, Morley's failure to comply with section 1823(e) caused him to lose the defenses. See W.H. Venture, 607 F.Supp. at 476. (Continental's transfer of Morley's loan to the FDIC did not cause the alleged injury; rather, the company's failure to secure in writing its modifications in accordance with section 1823(e) caused the harm).
 
 
 37
 Beyond concluding that Morley's failure to secure the "secret agreements" in writing caused Morley's loss of defenses, we find that Morley's "but for" argument is flawed. Morley argues that but for the improper assistance program, he would not have suffered an injury. We agree with the FDIC's contention that this "but for" argument ignores the structure of the financial assistance program.
 
 
 38
 Morley only challenges the assistance program's third part, the capital infusion into CIC. Morley does not challenge the validity of the first part, and the district court rejected Morley's challenge to the second part. Given the program's separate parts, the appropriate analysis considers whether "but for" the FDIC's infusion of capital into CIC Morley would have retained his defenses. See FDIC v. Main Hurdman, 655 F.Supp. 259, 270 (E.D.Cal.1987) (appropriate question is whether, but for infusion of capital into CIC, the party would be a defendant in the action).
 
 
 39
 In Main Hurdman, the court considered a nearly identical issue arising from the FDIC's acquisition of a Continental loan. Based on this loan, the FDIC sued an accounting firm for fraud, misrepresentation, and malpractice. The accounting firm argued that the CIC capital infusion exceeded the FDIC's statutory authority. The court held that the accounting firm lacked standing because the FDIC could have sued it even without the infusion of funds into CIC. Main Hurdman, 655 F.Supp. at 270 ("There is absolutely no reason to believe that if [the FDIC injected capital directly into Continental], a different arrangement would have been made; on the contrary, it seems apparent that the exact same assignment would have resulted, and the defendant would have been sued.").
 
 
 40
 As in Main Hurdman, the allegedly improper capital infusion did not effect Morley because the FDIC acquired Morley's loan under a different part of the plan. Even if Morley could prove that the capital infusion fell outside section 1823(c), the FDIC acquired his loan under the assistance program's delayed loan acquisition program; the FDIC conducted this second part of the plan pursuant to section 1823(c). Consequently, Morley would have lost his defenses even without the allegedly improper infusion of capital into CIC.
 
 
 41
 3. Favorable Court Action Would Not Redress the Loss of Defenses
 
 
 42
 Morley contends that a favorable court decision would redress his injury. Morley argues that if a court found that the CIC capital infusion did not comply with section 1823(c), such finding would necessarily remove the entire assistance agreement from section 1823(c). In contrast, the FDIC contends that even if a court granted Morley's declaration, the court would not order relief that would redress Morley's loss of defenses. We agree with the FDIC that any judicial relief would likely not restore Morley's affirmative defenses.
 
 
 43
 When a party contests another party's standing, the party claiming standing has the burden of proof to establish that the requested relief would redress the alleged injury. Although the redressability requirement lacks a precise definition, the Court has given some guidance. The redressability component addresses the causal connection between the party's injury and the requested relief. Allen, 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19, 82 L.Ed.2d at 571 n. 19. Therefore, the party must show that relief from the alleged injury will "likely" follow a favorable judicial decision. Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, 570 (1984).
 
 
 44
 The critical inquiry is whether "the prospect of obtaining relief from the injury as a result of a favorable ruling [is] too speculative[.]" Allen, 468 U.S. at 752, 104 S.Ct. at 3325, 82 L.Ed.2d at 570. A party overcomes the speculative relief hurdle by demonstrating that a favorable judicial decision will more plausibly result in relief than not. See Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 43, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450, 463 (1976) (no redressability because relief too speculative; "[s]o far as the complaint sheds light, it is just as plausible that the hospitals would forgo favorable tax treatment [and therefore not remedy the harm].").
 
 
 45
 Morley argues that a favorable court decision would remedy his injury because a court cannot treat separately the integrated assistance program's parts. To support this conclusion, Morley quotes from the Notice of Special Meeting to the shareholders: "[t]o consider an act upon a plan ... providing for assistance to Continental Illinois National Bank and Trust Company of Chicago ... and a restructuring of C.I. Corp. which includes the following elements, each of which is an integral part of a single plan...." Morley urges that this document unequivocally demonstrates that without the capital infusion into the holding company, no plan would have existed. Accordingly, the court cannot sever the holding company capital infusion program because finding such aspect outside section 1823(c) would remove the whole plan from the section.
 
 
 46
 We find Morley's claim of relief far too speculative. Even if the district court found that the CIC capital infusion did not comply with section 1823(c), Morley likely would not regain his defenses. First, the court could separate the assistance program's third part from the loan acquisition program because the FDIC clearly acquired the Continental loans, including Morley's loan, under section 1823(c). Therefore, section 1823(e) would still bar Morley's defenses.
 
 
 47
 Second, the court could hold that the assistance program constituted a valid plan even though the CIC capital infusion placed the entire plan outside section 1823(c). Under this scenario, Morley would not gain relief. Federal common law would likely bar Morley's defenses if the court concluded that the Continental assistance program was valid but not conducted pursuant to section 1823(c).[8]
 
 
 48
 Third, if the court held the entire Continental assistance program invalid, Morley still would not gain relief. Finding the whole plan invalid would place Continental in a failing condition, requiring FDIC assistance. As a result, the FDIC would modify the plan, particularly the capital infusion section. To alleviate confusion, the FDIC would likely acquire the same loans that it presently possesses. Consequently, Morley could still not raise his affirmative defenses. Based on these plausible alternatives, we find Morley's relief argument too speculative to satisfy the redressability requirement.
 
 
 49
 B. Prudential Considerations Counsel Against Morley's Standing
 
 
 50
 Morley contends that the prudential considerations do not require judicial restraint in this case. The FDIC contends that even if Morley satisfied the constitutional elements of standing, Morley lacks standing because as a borrower, he falls outside section 1823's zone of interests. We agree with the FDIC that prudential considerations divest Morley of standing even if he satisfies the constitutional elements.
 
 
 51
 Not only must a party demonstrate a judicially cognizable interest, but such party must also demonstrate that such interest is arguably within the zone of interests which the statute or constitutional guarantee protects. See Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184, 188 (1970); Saladin, 812 F.2d at 690. Applying this consideration, "[t]he essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.' " Clarke v. Securities Industry Assn., 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757, 769 (1987). Moreover, the Supreme Court has explained the proper analysis:
 
 
 52
 The zone of interest test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed the Congress intended to permit the suit.
 
 
 53
 Clarke, 479 U.S. at 399, 107 S.Ct. at 757, 93 L.Ed.2d at 769.
 
 
 54
 Section 1823(e) absolutely precludes the assertion of defenses that do not meet its requirements. See, e.g., Chatham Ventures, Inc. v. FDIC, 651 F.2d 355 (5th Cir.1981), cert. denied, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982) (collateral oral agreement defense prohibited). Congress enacted this bar to serve two purposes. First, section 1823 facilitates the FDIC's examination and inventory of a troubled bank's assets. See Langley v. FDIC, 484 U.S. 86, ----, 108 S.Ct. 396, 401, 98 L.Ed.2d 340, 347 (1987) (section 1823 enables the FDIC to rely on a bank's records when evaluating a bank's assets). Section 1823 allows the FDIC to quickly develop the best remedy for a troubled bank. See Hearings Before the House Banking Comm. on the 1950 Amendments to Federal Deposit Insurance Act, 81st Cong., 2d Sess. 41-42 (1950); See FDIC v. O'Neil, 809 F.2d 350, 353 (7th Cir.1987) (the FDIC can only make such quick decisions if it can disregard "secret oral agreements that may impair the value of [the bank's] assets.").
 
 
 55
 Second, in Langley, the Court noted that section 1823(e) prevents bank employees and debtors from colluding to fraudulently insert new terms into an agreement when a bank faces imminent failure. Thus, section 1823(e) implements a congressional policy to not bind the FDIC to anything outside a bank's loan documents upon purchasing these documents. FDIC v. MM & S Partners, 626 F.Supp. 681, 687 (N.D.Ill.1985).
 
 
 56
 Moreover, Congress designed the Federal Deposit Insurance Act (FDIA) to stabilize the national banking system and promote depositors' confidence in the system. Gunter v. Hutcheson, 674 F.2d 862, 865 (11th Cir.1982), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). Congress enacted the FDIA to protect depositors and bank shareholders, not to protect debtors of insured banks.
 
 
 57
 These authorities strongly support the conclusion that Morley, as a borrower, falls outside the FDIA's, and in particular, section 1823's zone of interests. In fact, Congress enacted section 1823 to protect the FDIC against debtors' claims. Thus, allowing Morley to challenge the assistance program would violate the Clarke test because Morley's interests are patently inconsistent with section 1823.
 
 
 58
 Numerous cases have held that debtors of insured banks lack standing to challenge the FDIC's actions. For example, one district court held that a borrower lacked standing to question the legality of the FDIC's receivership or acquisition of a bank's assets. See FDIC v. Moore, 448 F.Supp. 493, 496 (D.C.S.C.1978) (only the bank and its shareholders could challenge the FDIC's actions). Similarly, another district court concluded that a bank's debtors lacked standing to challenge the FDIC's decision to only accept some of the bank's liabilities. See FDIC v. Lesselyoung, 476 F.Supp. 938, 946 (E.D.Wis.),aff'd sub nom. FDIC v. Lauterbach, 626 F.2d 1327 (7th Cir.1980). These cases support our conclusion that the FDIA does not protect debtors' interests.
 
 C. Common Sense Supports No Standing
 
 59
 Common sense supports this conclusion. Speed is essential for the FDIC when faced with an imminent bank failure. Allowing borrowers to challenge FDIC financial assistance programs to failing banks would not only slow the FDIC, but it would render the FDIC completely ineffective. Because in most cases the FDIC acquires several bank loans, all such borrowers could challenge the FDIC's acquisition program. All of the borrowers could then stop any assistance program by challenging its validity. Given the inherent length of such litigation, such actions would preclude the FDIC from providing the essential timely assistance, and therefore from preventing threatened bank failures.
 
 CONCLUSION
 
 60
 We conclude that Morley lacks standing to assert his counterclaim to challenge the validity of the Continental assistance program under section 1823(c). We hold that Morley does not satisfy any of the constitutional requirements. Furthermore, we conclude that Morley's alleged harm falls outside the zone of interests of section 1823. For these reasons, we affirm the district court's decision that Morley lacks standing to assert his counterclaim.
 
 
 61
 AFFIRMED.
 
 
 
 [1]
 Although the FDIC wanted to infuse the capital directly into Continental, it purchased CIC's stock because Continental had previously issued bonds with restrictive covenants which prevented the FDIC from directly injecting the $1 billion into Continental. Moreover, time constraints prevented the FDIC from obtaining the bondholders' waiver of such covenants. See Note, The Modified Payoff of Failed Banks: A Settlement Practice to Inject Market Discipline into the Commercial Banking System, 73 Va.L.Rev. 1349, 1361 (1987)
 
 
 [2]
 Morley alleged that Continental intentionally sabotaged Morley's business venture in the following ways: (1) costing Morley $4 million to buy out certain partners whom Continental convinced to abandon the project; (2) inducing Morley to change the business from condominiums to rental apartments, and then providing preferential financing to a senior loan official's friend for a competitive real estate project adjacent to Morley's apartment complex; (3) financing this adjacent complex to rent its units at a below-market price; (4) inducing Morley to invest an additional substantial sum into his project by decreasing his loan payments, with Continental agreeing to refrain from foreclosing; and (5) inducing Morley to pay substantial amounts to the bank from sources which the loan agreement did not contemplate on the condition that Continental release encumbrances on other condominiums; then failing to release these units even though Morley substantially complied with the pay down request. As a result, Morley contends that these actions coerced him to execute the loan documents which the FDIC possesses
 
 
 [3]
 The relevant portion of section 1823(c) reads:
 (c) Assistance to insured banks
 (1) The Corporation is authorized, in its sole discretion and upon such terms and conditions as the Board of Directors may prescribe, to make loans to, to make deposits in, to purchase the assets or securities of, to assume the liabilities of, or to make contributions to, any insured bank--
 (A) if such action is taken to prevent the closing of such insured bank;
 (B) if, with respect to a closed insured bank, such action is taken to restore such closed insured bank to normal operation; or
 (C) if, when severe financial conditions exist which threaten the stability of a significant number of insured banks or of insured banks possessing significant financial resources, such action is taken in order to lessen the risk to the Corporation posed by such insured bank under such threat of instability.
 (2)(A) In order to facilitate a merger or consolidation of an insured bank described in subparagraph (B) with an insured institution or the sale of assets of such insured bank and the assumption of such insured bank's liabilities by an insured institution, or the acquisition of the stock of such insured bank, the Corporation is authorized, in its sole discretion and upon such terms and conditions as the Board of Directors may prescribe--
 (i) to purchase any such assets or assume any such liabilities;
 (ii) to make loans or contributions to, or deposits in, or purchase the securities of, such insured institution or the company which controls or will acquire control of such insured institution;
 (iii) to guarantee such insured institution or the company which controls or will acquire control of such insured institution against loss by reason of such insured institution's merging or consolidating with or assuming the liabilities and purchasing the assets of such insured bank or by reason of such company acquiring control of such insured bank; or
 (iv) to take any combination of the actions referred to in subparagraphs (i) through (iii).
 
 
 [4]
 Section 1823(e) provides:
 No agreement which tends to diminish or defeat the right, title or interest of the [FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the [FDIC] unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank. [Emphasis added.]
 
 
 [5]
 The district court concluded that section 1823(e) barred all of Morley's affirmative defenses, including the duress defense. Some district courts have concluded that section 1823(e) does not bar a duress defense. See FDIC v. Linn, 671 F.Supp. 547 (N.D.Ill.1987). In Linn, the court held that a claim of economic duress fell outside of section 1823(e). Quoting a prior decision, the court stated:
 It should be noted at the outset that the language of Sec. 1823(e) only denies validity to certain unwritten agreements, and does not bar extrinsic proof that a written document in fact does not reflect any valid agreement.
 Linn, 671 F.Supp. at 555 (quoting FDIC v. Powers, 576 F.Supp. 1167, 1170 (N.D.Ill.1983)). Other district court decisions have similarly concluded that section 1823(e) bars only "secret agreement" defenses and not defenses such as duress which challenge the underlying loan agreement's validity. See, e.g., FDIC v. MM & S Partners, 626 F.Supp. 681 (N.D.Ill.1985) (section 1823 does not apply to defenses which do not arise out of an alleged collateral agreement); FDIC v. Balistreri, 470 F.Supp. 752 (E.D.Wis.1979) (court dismissed alleged oral promise because section 1823(e) barred it, but dismissed economic duress defense on ground that record did not establish such defense); see also Norcross, The Bank Insolvency Game: FDIC Superpowers, the D'Oench Doctrine and Federal Common Law, 103 Banking L.J. 316, 331 (cases interpreting section 1823(e) allow debtors to assert real defenses such as illegality, duress and incapacity against the FDIC).
 As stated in his brief, Morley only challenged the district court's decision that he did not have standing to challenge the statutory basis for the FDIC's acquisitions of his loan. Because Morley no longer pursues his argument that even if the assistance program complied with section 1823(c), section 1823(e) does not bar the affirmative defenses, we deem it abandoned. Rogero v. Noone, 704 F.2d 518, 520 n. 1 (11th Cir.1983).
 
 
 [6]
 We also note that because we find that Morley lacks standing, we do not need to address the FDIC's alternate theory that federal common law bars Morley's defenses
 
 
 [7]
 The Supreme Court initially articulated the fairly traceable and redressability requirements as "two facets of a single causation requirement." C. Wright, Law of Federal Courts Sec. 13 p. 68 n. 43 (4th ed. 1983)
 
 
 [8]
 Federal common law would likely preclude Morley from raising his defenses. The federal courts have consistently precluded debtors from asserting defenses against the FDIC. See D'Oench, Duhme and Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956, reh'g denied, 315 U.S. 830, 62 S.Ct. 910, 86 L.Ed. 1224 (1942) (after FDIC acquired a note under a purchase and assumption program, the Court concluded that a party could not use a defense premised on an undisclosed agreement against the FDIC). Several cases decided after the enactment of section 1823(e) have applied D'Oench and its progeny to preclude borrowers' defenses. See, e.g., FDIC v. Gulf Life Ins. Co., 737 F.2d 1513 (11th Cir.1984). Moreover, the courts have interpreted the D'Oench rule more broadly than section 1823(e), therefore it serves as a second line of defense if section 1823(e) does not bar a debtor's defenses. See Norcross, The Bank Insolvency Game: FDIC Superpowers, the D'Oench Doctrine and Federal Common Law, 103 Banking L.J., 316, 331-32 (1980)
 We have articulated the D'Oench doctrine as barring the assertion of defenses "when the FDIC in its corporate capacity obtains an asset in the course of a purchase and assumption transaction, for value, in good faith, and without knowledge of the defenses...." Gulf Life Ins. Co., 737 F.2d at 1518. We do not, however, believe that the D'Oench doctrine only applies to a traditional purchase and assumption transaction. First, policies which support barring defenses against the FDIC in a purchase and assumption transaction equally apply to the Continental financial assistance program. Primarily, the D'Oench doctrine recognizes the FDIC's need to proceed quickly and therefore it bars defenses that would impede the FDIC's ability to quickly select an alternative to save the failing bank. Gulf Life Ins. Co., 737 F.2d at 1517. Related to this first policy, the D'Oench doctrine allows the FDIC to make an informed and proper choice as to a proper alternative for assisting a failing bank without being misled by secret agreements. Gulf Life Ins. Co., 737 F.2d at 1517. The Continental assistance program implicates both of these policies.
 Second, several district courts have recognized the applicability of the D'Oench bar to debtors' defenses over Continental loans which the FDIC acquired. See, e.g., FDIC v. W.H. Venture, 607 F.Supp. 473 (E.D.Pa.1985); FDIC v. Key Biscayne Development Association, No. 84-2570-CIV-ZLOCH, slip op. (S.D.Fla. June 3, 1986), aff'd, 858 F.2d 670 (11th Cir.1988). Thus, these cases have applied the D'Oench doctrine to the Continental direct assistance program even though it does not constitute a purchase and assumption program. Morley argues that these cases are distinguishable because in all of the cases the FDIC acquired those loans immediately; the FDIC acquired Morley's loan nearly three years after implementing the plan. We do not find this distinction persuasive. The FDIC developed its entire plan under the pressure of a bank failure. In evaluating the necessity of its action, the FDIC looked to Continental's entire loan portfolio and agreed to acquire a certain amount of loans in the future. The FDIC made this decision under severe time pressure. Furthermore, the FDIC was entitled to rely on the loan documents accurately representing the loan agreements. We see no reason not to apply the D'Oench doctrine to such acquisition as long as the FDIC met the other requirements of acquiring such loan in good faith and without knowledge of the defenses.