920 F.2d 752
 55 Empl. Prac. Dec. P 40,564
 S.J. GROVES & SONS COMPANY and Jasper Construction Company,
Plaintiffs-Appellees,
v.
FULTON COUNTY, Defendant-Appellant,
U.S. Department of Transportation, Defendant.
S.J. GROVES & SONS COMPANY and Jasper Construction Company,
Plaintiffs-Appellees,
v.
FULTON COUNTY, Defendant-Cross-Claim Plaintiff-Appellant.
S.J. GROVES COMPANY and Jasper Construction Company,
Plaintiffs-Appellees,
v.
FULTON COUNTY, Defendant-Cross-Claim Plaintiff-Appellant,
United States Department of Transportation and James H.
Burnley, IV, Secretary, United States Department
of Transportation, Defendant-Cross-Claim
Defendants-Appellees.
S.J. GROVES & SONS COMPANY and Jasper Construction Co.,
Inc., Plaintiffs-Appellees,
v.
FULTON COUNTY, Defendant-Appellant,
United States Department of Transportation, James H.
Burnley, IV, Secretary, United States Department
of Transportation, Defendants-Appellees.
 Nos. 86-8105, 88-8536, 88-8573 and 88-8700.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 7, 1991.
 
 Keith Weiner, Webb & Daniel, Atlanta, Ga., for Fulton County.
 Terrence Lee Croft, Peter A. Wade, W. Henry Parkman, C. Wilson DuBose, Griffin, Cochrane, Marshall & Elger, Atlanta, Ga., for S.J. Groves & Sons, Jasper Const. Co.
 William O. Miller, G. Stephen Parker, Robert B. Baker, Jr., Southeastern Legal Foundation, Inc., Atlanta, Ga., for amicus Southeastern Legal Foundation, Inc.
 Mark L. Gross, Dept. of Justice, Civil Rights Div., Washington, D.C., for U.S. Dept. of Transp.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before KRAVITCH and COX, Circuit Judges, and DYER, Senior Circuit Judge.
 COX, Circuit Judge:
 
 I. FACTS AND PROCEDURE
 A. Facts
 
 1
 The Federal Aviation Administration (FAA) of the Department of Transportation (DOT) has designated Fulton County Airport (also known as Brown Field) a "reliever" airport. This means that it is an alternative destination for freight and cargo flights away from the primary passenger airport in the area, Hartsfield International Airport. In 1981, the FAA determined that the instrumented runway at Fulton County Airport was in "rapidly deteriorating condition." District Court Order, Sept. 30, 1985, R.6-103-2. The FAA threatened to close the runway, which would have resulted in the airport losing its status as a reliever airport. Id.
 
 
 2
 In order to avoid this result, the Fulton County Board of Commissioners decided that the runway should be repaired. The County applied for a grant from the FAA under the Airport and Airway Development Act of 1970, as amended (AADA). Under a program created by that statute, the federal government would fund ninety percent of the project, the state of Georgia would fund five percent, and Fulton County would fund five percent. As a condition of receiving the grant, Fulton County was required to develop and submit for approval to the FAA an MBE (Minority Business Enterprise)[1] program for the project. The program had to meet the requirements set forth in regulations promulgated by the Department of Transportation (the DOT regulations). These regulations are set out at 49 C.F.R. Sec. 23.1--23.55.
 
 
 3
 Fulton County developed an MBE program (the specifics of the program are discussed in Part III of this opinion), and the FAA approved it and awarded the funds to the County. Once the funds were received, the County invited bids from contractors. S.J. Groves & Sons, Co. (Groves)[2] submitted a timely bid of $818,432.40, the lowest bid the County received. The Groves bid included MBE participation of 4.15%.[3] The County Commission awarded the contract to Groves, on condition that it make a good faith effort to increase the level of its proposed MBE participation. The extent of Groves's good faith efforts to increase MBE participation is disputed. The County Commission decided Groves had not in good faith attempted to increase MBE participation and awarded the contract to the second-lowest bidder, Dickerson, Inc., whose bid contained an MBE participation level of 10%. The award was again conditioned on good faith efforts to increase MBE participation. Dickerson was able to increase MBE participation to 16% within two days. The Commission then permanently awarded the contract to Dickerson.
 
 B. Procedural History
 
 4
 The protracted procedural history of this case began in August 1982 when Groves, after an unsuccessful attempt to obtain equitable relief, filed a complaint against Fulton County in the district court for the Northern District of Georgia. Subject matter jurisdiction was grounded in diversity.
 
 
 5
 Subsequently, the district court permitted Groves to file five amended complaints. Groves alleges the following: Count I--Fulton County breached its promise as contained in the invitation to bid by not awarding the contract to the lowest bidder; Count II--Fulton County had no authority to promulgate the MBE program because it conflicts with the Georgia low-bid statute, and the MBE program is therefore invalid; Count III--the MBE program is unconstitutional under the Georgia Constitution; Count IV--the MBE program violates Title VI of the Civil Rights Act of 1964; Count V--the MBE program violates the equal protection component of the Fourteenth Amendment of the federal Constitution; Count VI--Fulton County's 1984 MBE resolution,[4] on its face, violates the equal protection component of the Fourteenth Amendment; Count VII--the 1984 MBE Resolution, on its face, violates the Georgia low-bid statute; Count VIII--the 1984 MBE Resolution, on its face, violates Title VI.[5] Counts IX and X--the DOT regulations violate, inter alia, the equal protection component of the Fifth Amendment of the federal Constitution.[6] Groves seeks damages on Counts I through V and equitable relief on Counts VI through X.
 
 
 6
 The district court, over the course of several years,[7] issued three separate orders in this case. Each order resulted from cross-motions for summary judgment. These orders are now before us on interlocutory appeal. Following is a brief summary of the district court's resolution of each count. More detailed discussion of the district court's findings and orders will accompany our discussion of the issues.
 
 
 7
 First, the district court denied summary judgment on Count I because Groves's good faith efforts to meet the MBE requirements on the airport project contract are disputed. Second, the court granted summary judgment in favor of Groves on Counts VI through VIII because the court found that "the actions of Fulton County in enacting the airport program and the 1984 [MBE] Resolution violate Georgia's low-bid statute." District Court Order, Sept. 30, 1985, R. 6-103-24. The County was enjoined from enforcing the 1984 Resolution. Next, the court held the DOT regulations violate the equal protection component of the Fifth Amendment and are therefore unconstitutional. Therefore, summary judgment was entered in favor of Groves on Counts IX and X.[8] Finally, the district court granted summary judgment for Groves on Counts II, IV and V. Because the DOT regulations are unconstitutional, the court ruled, they cannot preempt the Georgia low-bid statute. Further, Fulton County had no other defense to its violation of the state statute, and the court consequently held the County liable to Groves.[9]
 
 
 8
 II. PARTIES' CONTENTIONS AND ISSUES ON APPEAL
 
 
 9
 Essentially, Groves complains of two things Fulton County has done. First, Groves claims the County's 1984 MBE Resolution is not authorized by state or federal law and puts Groves at a disadvantage in bidding on Fulton County public works projects. Therefore, the injunction preventing enforcement of the resolution should be affirmed. Second, Groves claims it should have been awarded the airport paving contract pursuant to the Georgia low-bid statute. Fulton County awarded the contract to another bidder, Groves asserts, based on an unconstitutional MBE program that the County had no authority to enact.
 
 
 10
 Fulton County argues that Groves lacks standing to challenge the 1984 Resolution and that regardless, the resolution is constitutional. The County further contends that it is authorized by the low-bid statute to take compliance with MBE requirements into account in awarding contracts. Finally, the County asserts that even if it did violate the low-bid statute, it has a valid defense that prohibits a finding of liability to Groves.
 
 
 11
 We are called upon in this appeal to resolve the following issues. First, does Groves have standing to challenge the County's 1984 MBE Resolution, and if it does, is the resolution constitutional. Second, in awarding the 1982 airport project contract to a bidder other than Groves, did the County violate the Georgia low-bid statute. Finally, if the County did transgress state law, does it have a valid defense to the violation.
 
 III. DISCUSSION
 
 12
 Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).
 
 A. The 1984 MBE Resolution
 
 13
 In 1979, Fulton County enacted a resolution that called for a goal of twenty percent participation by MBEs in all county contracts (the 1979 MBE Resolution). The County Commission decided to update the resolution and directed Clarence Reid, the County's affirmative action officer, to conduct a study of MBE participation in Fulton County contracts. After conducting personal meetings, compiling data and reviewing similar programs instituted by other local governments, as well as by the Metro Atlanta Rapid Transit Authority, the Reid study concluded that MBE participation in County contracts was disproportionately low. The cause of the problem, according to the study, was systemic racial discrimination.
 
 
 14
 In 1984, the County Commission ordered the County Manager to develop an MBE program to replace the 1979 MBE Resolution. The County enacted such a program on June 6, 1984 (the 1984 MBE Resolution). The program retained the twenty percent MBE participation goal. Groves asserts the district court was correct in awarding declaratory and injunctive relief in Groves's favor. Groves asserts the 1984 Resolution injures it and is unconstitutional and therefore the district court's order awarding declaratory and injunctive relief in Groves's favor should be affirmed.
 
 1. Standing
 
 15
 Fulton County contests Groves's standing to attack the 1984 MBE Resolution. Standing is a jurisdictional prerequisite to a suit in a federal court. Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 475-76, 102 S.Ct. 752, 760-61, 70 L.Ed.2d 700 (1982). The district court determined Groves has standing to challenge the resolution. See R. 6-103-27.
 
 
 16
 There is no dispute regarding the facts relevant to the standing question. We therefore must review the law of standing and determine if Groves has standing to challenge the 1984 Resolution under the facts of this case. A litigant has standing when the party has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions...." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).
 
 
 17
 The Supreme Court has developed an analytical framework that is useful in resolving standing questions. Under this framework, the standing doctrine has two components: "irreducible" constitutional requirements and prudential considerations. Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 758; FDIC v. Morley, 867 F.2d 1381, 1386 (11th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 75, 107 L.Ed.2d 41 (1990). To satisfy the standing doctrine's constitutional component, a litigant must demonstrate three elements. First, the party must have suffered an actual injury or show the imminence of such injury. Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 758; E.F. Hutton & Co. v. Hadley, 901 F.2d 979, 984 (11th Cir.1990); Morley, 867 F.2d at 1386. Second, the injury must be "fairly traceable to the challenged conduct." Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 758; E.F. Hutton, 901 F.2d at 984; Morley, 867 F.2d at 1386. Third, the party must demonstrate that a favorable decision likely will redress the injury. Valley Forge Christian College, 454 U.S. at 472, 102 S.Ct. at 758; E.F. Hutton, 901 F.2d at 984; Morley, 867 F.2d at 1386.
 
 
 18
 After satisfying the constitutional component of the standing doctrine, a party must show that "prudential considerations do not favor judicial restraint from hearing such action." Morley, 867 F.2d at 1386. The Supreme Court has listed three considerations that discourage judicial action despite a party's satisfaction of all three constitutional requirements: (1) assertion of a third party's rights; (2) allegation of a generalized grievance instead of an injury peculiar to the litigant; and (3) assertion of an injury outside the statute's or constitutional provision's zone of interests. Valley Forge Christian College, 454 U.S. at 474-75, 102 S.Ct. at 759-60; Morley, 867 F.2d at 1386.
 
 
 19
 a. Actual or Imminent Injury
 
 
 20
 Groves contends the existence of the 1984 Resolution presents two threatened injuries sufficient to satisfy constitutional requirements. The district court found that Groves is a large, national contractor that can often complete contracts with little or no subcontracting. District Court Order, Sept. 30, 1985, R. 6-103-26. Therefore, Groves argues, forcing compliance with the 1984 Resolution's criteria, including its 20% MBE participation goal, will require unnecessary subcontracting. Groves's first claimed injury, then, is a threatened loss of potential profits. If Groves were awarded a Fulton County construction contract, Groves asserts its profit margin on that contract would be smaller than Groves's profit margins on contracts with government entities that do not have MBE programs. Groves's second claimed injury is a "lost opportunity, strictly on the basis of race, to compete equally with other contractors for Fulton County projects." Appellee's Brief, No. 86-8105 at 9.
 
 
 21
 To have standing, a litigant must have suffered or be in imminent danger of suffering a "distinct and palpable injury" instead of an "abstract" or "conjectural" injury. Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 reh'g denied, 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942 (1984) (citations omitted); Morley, 867 F.2d at 1387. The injury or threat of injury "must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' " Pollard v. Cockrell, 578 F.2d 1002, 1006 (5th Cir.1978) (quoting O'Shea v. Littleton, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)).[10]
 
 
 22
 Groves's second claimed injury, lost opportunity to compete on an equal basis with other bidders, is not a cognizable Article III injury. Nothing in the 1984 Resolution prevents Groves from bidding on any Fulton County contract under the same terms as any other bidder. Therefore, Groves is able to compete with other bidders on an equal basis. Were we to agree with Groves's reasoning regarding this so-called injury, then bidders subject to any universally applicable requirements (e.g. time of bid, manner of bid, place of bid) would allege injury sufficient to satisfy the standing requirement.
 
 
 23
 We reach the same conclusion, for different reasons, regarding Groves's first claimed injury, loss of potential profits. We find the Supreme Court's opinion in Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), controlling on this point. In Warth, Rochester Home Builders Association (Home Builders) sought to intervene in a suit challenging the town of Penfield's zoning ordinance. Home Builders alleged that the zoning ordinance "had deprived some of its members of 'substantial business opportunities and profits.' " Id. at 515, 95 S.Ct. at 2213. The Court decided that Home Builders did not have standing to seek equitable relief. "The complaint refers to no specific project of any of its members that is currently precluded either by the ordinance or by [the town of Penfield's] action in enforcing it. There is no averment that any member has applied to [Penfield] for a building permit or a variance with respect to any current project." Id. at 516, 95 S.Ct. at 2214.
 
 
 24
 Similarly, Groves has pointed to no contract it was denied because of the 1984 Resolution. Nor has Groves alleged it has ever bid for a single contract that was subject to the resolution. Groves points to Fulton County's denial of the airport project contract because of the 1982 MBE Program. Because the district court found that the 1982 Program was in no way related to the 1984 Resolution (District Court Order, Sept. 30, 1985, R.6-103-3), this allegation is insufficient to satisfy the injury requirement of the standing doctrine.
 
 
 25
 The case law cited by Groves is likewise unavailing. Some of these cases involve situations where contracts were set aside for minority bidders only. See Investment Co. Institute v. FDIC, 815 F.2d 1540, 1543 (D.C.Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987) (FDIC rule dealt petitioners competitive injury by allowing insured nonmember banks to enter the securities field indirectly through subsidiaries and affiliates); Ray Baillie Trash Hauling, Inc. v. Kleppe, 477 F.2d 696, 699-701 (5th Cir.), reh'g denied, 478 F.2d 1403 (5th Cir.1973), cert. denied, 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 468 (1974) (SBA program at issue authorized SBA to set aside contracts for placement with small businesses owned by disadvantaged persons; plaintiff not allowed to compete for contract in question; recipient of contract received premium price not available to non-disadvantaged businesses). That is not the case here; the 1984 Resolution permits Groves to bid for all Fulton County contracts. Other cases cited by Groves present much more concrete injuries than the injury Groves asserts in this case. See Uzzell v. Friday, 592 F.Supp. 1502, 1514 (M.D. N.C.1984) (plaintiffs had standing because they were denied the opportunity to compete on an equal basis with other members of the student body); Rhode Island Chapter, Associated Gen. Contractors of America, Inc. v. Kreps, 450 F.Supp. 338, 346-47 n. 3 (D.R.I.1978) (some contractors lost contracts they would have been awarded but for the MBE program); Wright Farms Constr., Inc. v. Kreps, 444 F.Supp. 1023, 1027 (D.Vt.1977) (plaintiff presented uncontroverted evidence that but for the MBE program, it would have received public works contracts).
 
 
 26
 The only case Groves cites that directly supports its position is Contractors Association of Eastern Pennsylvania v. Secretary of Labor, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971). That case is of questionable authority, however, for two reasons. First, it predates Warth. Second, the opinion cites Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), to support the proposition that contractors who have not bid on projects that are subject to MBE requirements and have not identified specific projects they wish to bid on may still establish standing. However, Abbott Laboratories, in the standing context, stands for the proposition that a drug manufacturer need not expose itself to FDA sanctions in order to establish standing. Id. at 154, 87 S.Ct. at 1518. Groves is not in a similar position of having to expose itself to potential sanctions in order to establish standing.[11]
 
 
 27
 Because Groves fails to satisfy the first constitutional requirement of standing, injury, a discussion of the other two constitutional requirements, causation and redressability, is unnecessary. Likewise, an examination of the standing doctrine's prudential component would be superfluous. We will vacate the district court's order and judgment on Counts VI through VIII and remand with instructions to dismiss the claims presented by those counts for lack of standing. We now proceed to a discussion of Groves's claim that Fulton County violated the Georgia low-bid statute by creating the 1982 MBE program and relying on it in not awarding the airport project contract to Groves.
 
 B. The 1982 MBE Program
 
 28
 Fulton County does not contest Groves's standing to challenge the 1982 MBE Program. Nor could it because Groves clearly has standing to attack the program because it was denied the contract for the airport project because of its alleged failure to make a good faith attempt to meet the program's MBE goals. The district court found that Fulton County developed the 1982 Program for one purpose only: to comply with DOT regulations in order to obtain a grant under the AADA. District Court Order, Sept. 30, 1985, R.6-103-3. Fulton County's claim that the 1982 Program is valid is therefore bottomed on its assertion that the DOT regulations are constitutional.
 
 1. The DOT Regulations
 
 29
 A good summary of the DOT regulations is found in the district court's March 30, 1987, order, S.J. Groves & Sons Co. v. Fulton County, 696 F.Supp. 1480, 1482-83 (N.D.Ga.1987):
 
 
 30
 DOT's regulation entitled "Participation by Minority Business Enterprise in Department of Transportation Programs" is found at 49 C.F.R. Sec. 23.01 et seq.[12] The regulation defines minority as follows:"Minority" means a person who is a citizen or lawful permanent resident of the United States and who is:
 
 
 31
 (a) Black (a person having origins in any of the black racial groups of Africa);
 
 
 32
 (b) Hispanic (a person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race);
 
 
 33
 (c) Portuguese (a person of Portuguese, Brazilian, or other Portuguese culture or origin, regardless of race);
 
 
 34
 (d) Asian American (a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands);
 
 
 35
 (e) American Indian and Alaskan Native (a person having origins in any of the original peoples of North America); or
 
 
 36
 (f) Members of other groups, or other individuals, found to be economically and socially disadvantaged by the Small Business Administration under section 8(a) of the Small Business Act, as amended (15 U.S.C. Sec. 637(a)).
 
 
 37
 49 C.F.R. Sec. 23.5. "Minority business enterprise" or "MBE" is defined as "a small business concern ... which is owned and controlled by one or more minorities or women." Id.
 
 
 38
 The MBE regulation requires recipients of DOT funds (state and local governments) to implement an MBE program incorporating certain specific features. The regulation does not set a uniform percentage goal but leaves it to the recipients to do so. Among the required components of MBE programs are the following:
 
 
 39
 (a) A policy statement expressing a commitment to use MBEs in all aspects of contracting to the maximum extent feasible;
 
 
 40
 (b) The designation of an MBE liaison officer;
 
 
 41
 (c) Affirmative action techniques to facilitate MBE participation in contracting, including the following:
 
 
 42
 (1) arranging solicitations, time for the presentation of bids, quantities, specifications, and delivery schedules so as to facilitate the participation of MBEs;
 
 
 43
 (2) providing assistance to MBEs in overcoming barriers such as the inability to obtain bonding, financing, or technical assistance; and
 
 
 44
 (3) carrying out information and communications programs on contracting procedures and specific contracting opportunities in a timely manner, with such programs being bilingual where appropriate.
 
 
 45
 (d) Encouraging the use of banks owned or controlled by minorities or women;
 
 
 46
 (e) Making an MBE directory available to bidders;
 
 
 47
 (f) Certification of the eligibility of MBEs by the recipient, to ensure that the MBE program benefits only firms owned and controlled by minorities;
 
 
 48
 (g) Establishing percentage goals for the dollar value of work to be awarded to MBEs, including overall goals and goals on each specific prime contract with subcontracting possibilities; overall goals are to be based on a projection of the number and types of MBEs likely to be available to compete for contracts; goals for specific contracts are to be based on the known availability of qualified MBEs; and
 
 
 49
 (h) A requirement that bidders who do not meet the MBE contract goals satisfy the recipient that the bidder has made "good faith efforts" to meet the goals.[13]See 49 C.F.R. Sec. 23.45.
 
 
 50
 Finally, the regulation includes a provision allowing exemptions from the above-listed requirements if "the particular situation is exceptional" and if "the modified program complies substantially" with the regulations. Id. Sec. 23.41(f).
 
 
 51
 2. The 1982 MBE Program Violates the Georgia Low-Bid Statute
 
 
 52
 The district court decided that Georgia law does not give Fulton County the authority "to enact race-conscious contracting requirements." District Court Order, Sept. 30, 1985, R.6-103-12. Our review of Georgia law leads us to the same conclusion.
 
 
 53
 Fulton County argues that its 1982 MBE Program "merely adds another element of responsiveness and responsibility that must be satisfied by a bidder in the competitive bidding process," (Appellant's Brief in No. 86-8105 at 37)[14] and that the County had authority to enact the program.
 
 
 54
 The Georgia low-bid statute provides as follows:
 
 
 55
 Whenever it becomes necessary to build or repair any courthouse, jail, bridge, causeway, or other public works in any county, the county governing authority shall cause the same to be built or repaired by letting out the contract therefor to the lowest bidder, at public outcry, before the courthouse door, after having advertised the letting of the contracts, ... provided that such county authorities shall have authority to reject any and all bids at the public letting. If, in their discretion, the public interest and economy require it, the county authorities may build or repair any public buildings, bridges, causeways, or other public property in the county by contract or sealed proposals, ...
 
 O.C.G.A. Sec. 36-10-2 (Supp.1990).[15]
 
 56
 No Georgia case has dealt directly with the issue of a county's authority to enact an MBE program. However, one Georgia case involves an analogous situation. Georgia Branch, Associated General Contractors of America, Inc. v. City of Atlanta, 253 Ga. 397, 321 S.E.2d 325 (1984), involved a challenge to Atlanta's MBE program. The Atlanta program, except for differences in MBE participation goals, was very similar to the Fulton County MBE program at issue here. A group of contractors attacked the program as violative of Georgia and federal law. A unanimous Supreme Court of Georgia decided that the City lacked authority to enact such a program, and therefore avoided reaching the plaintiffs' constitutional claims. In so doing, the court interpreted a provision in the Atlanta City Charter, Ga.Code Ann. Sec. 6-402, that required the awarding of public works contracts to the "lowest and/or best bidder." The court stated that "the legislative purpose [of the requirement] was to further the cause that contracts be awarded without favoritism to obtain reasonable quality at the lowest cost." Id. at 399, 321 S.E.2d at 328. Because the Atlanta MBE program conflicted with this purpose (i.e., it sometimes required the awarding of a contract, on the basis of race, to a bidder who was not the lowest qualified bidder) the program was declared void. Id.
 
 
 57
 The County argues that Georgia Branch is distinguishable because the opinion did not discuss the Georgia low-bid statute and because the low-bid statute contains different language than the Atlanta Charter provision at issue in Georgia Branch. We have already indicated that no Georgia case is directly on point, but for several reasons we believe Georgia Branch gives us a good indication of how a Georgia court would rule on this question. First, the Supreme Court of Georgia did not discuss the Georgia low-bid statute in Georgia Branch for the obvious reason that it is inapplicable to cities--it applies to counties only. Second, the language "lowest and/or best bidder" is quite similar to "lowest bidder." Third, in reaching its conclusion, the court in Georgia Branch discussed another Georgia case and several cases from other jurisdictions which had dealt with somewhat different language, in some instances language closer to the language found in the Georgia low-bid statute. See Associated Gen. Contractors of California v. San Francisco Unified School Dist., 616 F.2d 1381 (9th Cir.1980) ("lowest responsible bidder"); Arrington v. Associated Gen. Contractors of America, Alabama Branch, 403 So.2d 893 (Ala.1981), cert. denied, 455 U.S. 913, 102 S.Ct. 1265, 71 L.Ed.2d 453 (1982) (same); City of Inglewood-L.A. County Civic Center Auth. v. Superior Court, 7 Cal.3d 861, 103 Cal.Rptr. 689, 500 P.2d 601 (1972) (same); Hilton Constr. Co. v. Rockdale County Bd. of Educ., 245 Ga. 533, 266 S.E.2d 157 (1980) ("the responsible bidder submitting the lowest acceptable bid").
 
 
 58
 The County also argues that the low-bid statute, by its terms, allows the County to reject "any and all bids"; therefore, the County may reject a bid based on a failure to meet MBE requirements. This argument is again refuted by Georgia case law. Manly Building Co. v. Newton, 114 Ga. 245, 40 S.E. 274 (1901), is the seminal case discussing the low-bid statute. The Manly court noted that the original statute had no provision in it for rejecting any and all bids, nor did it allow for sealed bids. Id. at 249, 40 S.E. at 276. In 1881, the statute was amended to add these provisions. Id. at 249-50, 40 S.E. at 276. A unanimous Georgia Supreme Court in discussing the meaning of the statute noted:
 
 
 59
 The plain meaning of the first section of the act as amended is, that county authorities may, after due advertisement, cause a court-house to be built by letting out the contract therefor to the lowest bidder at public outcry before the court-house door, or they may advertise for sealed proposals for the erection of the building, and let the contract thereunder. They may do either in the first instance; or they may, if they have undertaken to let the contract to the lowest bidder before the court-house door and have rejected all bids, then proceed to advertise for sealed proposals.
 
 
 60
 Id. at 251, 40 S.E. at 277 (emphasis added). The court went on to explain:
 
 
 61
 The provision allowing the county to reject any and all bids was found to be necessary, we suppose, because of the fact that, by a combination between bidders at a public letting, the county might be forced to pay a price largely beyond the value of the work, ... hence for the protection of a county, came the enactment of the provision giving the right to reject any and all bids at such letting.
 
 
 62
 Id. at 250, 40 S.E. at 276. Therefore, the purpose of the "any and all" provision was to protect a county against collusion by contractors at a public letting. The provision was not intended to allow a county to reject sealed low bids submitted by qualified contractors.
 
 
 63
 Indeed, the purpose of the statute, we believe, is the same as the Atlanta City Charter provision construed in Georgia Branch: to "insure the interest of the public in having contracts awarded without favoritism so that projects will be done ... without excessive cost, and constructed at the lowest price consistent with the reasonable quality and expectation of completion." Georgia Branch, 253 Ga. at 399, 321 S.E.2d at 327 (quoting City of Inglewood--L.A. County Civic Center Auth. v. Superior Court, 7 Cal.3d 861, 103 Cal.Rptr. 689, 692, 500 P.2d 601, 605 (1972)). Other Georgia cases have similarly emphasized that the purpose of the statute is to obtain quality work at the lowest possible cost. See, e.g., Mark Smith Constr. Co. v. Fulton County, 248 Ga. 694, 285 S.E.2d 692 (1982); Hilton Constr. Co. v. Rockdale County Bd. of Educ., 245 Ga. 533, 266 S.E.2d 157 (1980).
 
 
 64
 The County makes a final argument that it had authority to enact the program under its home rule charter, which is found in the Georgia Constitution. It reads as follows:
 
 
 65
 The governing authority of each county shall have legislative power to adopt ... resolutions ... for which no provision has been made by general law and which is not inconsistent with this constitution or any local law applicable thereto.
 
 
 66
 Ga. Const. art. IX, Sec. 2, par. 1. Because provision has been made by general law for the letting of public works contracts, and the Fulton County MBE Program conflicts with that general law, the home rule charter does not authorize the County to enact the program.
 
 
 67
 Finally, we note that in 1986 the Georgia legislature enacted O.C.G.A. Sec. 36-10-2.1, which permits Georgia counties of a certain size to consider compliance with an MBE program as an element of a bidder's responsibility.[16] Fulton County argues the enactment of this statute affirms the County's authority to take MBE compliance into account in letting contracts prior to 1986. Groves asserts the enactment of the statute proves the County did not have such authority before 1986. We agree with neither position. The enactment of a statute by a Georgia legislature in 1986 sheds no light on the intent of a nineteenth-century Georgia legislature.
 
 3. Fulton County's Defenses
 
 68
 Because Fulton County had no authority to enact the 1982 MBE Program, by awarding the airport project contract to Dickerson, Inc., instead of Groves, the lowest responsible bidder, the County violated the state low-bid statute. The County may escape liability if it has a defense to its violation of state law. Fulton County offers three defenses: preemption, reliance on presumptively valid federal regulations, and constitutional estoppel.
 
 
 69
 a. Preemption
 
 
 70
 The County's first defense to its violation of the Georgia low-bid statute is that the DOT regulations, upon which the 1982 MBE Program was based, preempt the state statute. Of course, when Congress acts pursuant to its delegated powers, conflicting state law must yield. See generally J. Nowak, R. Rotunda, J. Young, Constitutional Law (3d ed. 1986) Sec. 9.1. Further, regulations promulgated pursuant to a congressional delegation of authority can also preempt state law. See Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).
 
 
 71
 However, only measures that are constitutional may preempt state law. The Supremacy Clause, from which the preemption doctrine derives, see id. at 152, 102 S.Ct. at 3022, provides that: "This Constitution, and the Laws of the United States which shall be made in pursuance thereof ... shall be the supreme Law of the Land...." U.S. Const. art. VI, cl. 2 (emphasis added). Chief Justice Marshall stated that "[t]he appropriate application of that part of the clause which confers the same supremacy on laws and treaties, is to such acts of the State legislatures as do not transcend their powers, but, though enacted in the execution of acknowledged State powers, interfere with, or are contrary to the laws of Congress, made in pursuance of the Constitution ..." Gibbons v. Ogden, 22 U.S. (4 Wheat.) 1, 211, 6 L.Ed. 23 (1824) (emphasis added). See also Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 203, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983) ("It is well established that within constitutional limits Congress may preempt state authority....") (emphasis added); Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 reh'g denied, 431 U.S. 925, 97 S.Ct. 2201, 53 L.Ed.2d 240 (1977) (same); Rollins Environmental Services (FS), Inc. v. Parish of St. James, 775 F.2d 627, 634 (5th Cir.1985) (same). To hold that Congress could preempt state laws by enacting unconstitutional acts would be directly contrary to deeply rooted principles of Federalism.[17] Consequently, we conclude that Fulton County's preemption defense is only available if the DOT regulations are constitutional.
 
 
 72
 1. The Constitutionality of the DOT Regulations
 
 
 73
 As an initial matter, we must dispose of two questions of authority: Congress's authority to enact the program embodied in the DOT regulations and the DOT's authority to create such a program. These initial inquiries are mandated both by Supreme Court precedent, see Fullilove v. Klutznick, 448 U.S. 448, 476-77, 100 S.Ct. 2758, 2773-74, 65 L.Ed.2d 902 (1980), and by precedent in this circuit, see South Florida Chapter of the Associated Gen. Contractors of America, Inc. v. Metropolitan Dade County, 723 F.2d 846, 852 (11th Cir.), reh'g denied, 729 F.2d 1468, cert. denied, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984).
 
 
 74
 The first question is answered by Fullilove. There, the Supreme Court decided that Congress had "employed an amalgam of its specifically delegated powers" in enacting an MBE program similar to the MBE program contained in the DOT regulations. Fullilove, 448 U.S. at 473, 100 S.Ct. at 2772. The answer to the second question is unfortunately not as clear.
 
 
 75
 Federal regulations have no less preemptive effect than federal statutes. Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). However, regulations must not be "unreasonable, unauthorized, or inconsistent with" the statute that authorizes them. Free v. Bland, 369 U.S. 663, 668, 82 S.Ct. 1089, 1093, 8 L.Ed.2d 180 (1962). "What is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued." Chrysler Corp. v. Brown, 441 U.S. 281, 308, 99 S.Ct. 1705, 1721, 60 L.Ed.2d 208 (1979).
 
 
 76
 The DOT identifies eight sources of authority for the regulations:
 
 
 77
 (1) Section 905 of the Railroad Revitalization and Regulatory Reform Act of 1976;
 
 
 78
 (2) Title VI of the Civil Rights Act of 1964;
 
 
 79
 (3) Section 30 of the Airport and Airway Development Act of 1970;
 
 
 80
 (4) The Urban Mass Transportation Act of 1964;
 
 
 81
 (5) The Federal Property and Administrative Services Act of 1949;
 
 
 82
 (6) Title 23 of the U.S. Code (relating to federal highways and highway safety);
 
 
 83
 (7) Executive Order 11625;
 
 
 84
 (8) Executive Order 12138.
 
 
 85
 49 C.F.R. Sec. 23.1(b).
 
 
 86
 Whether some of these sources of "authority" could be construed to allow the DOT to enact an affirmative action program is questionable, at the very least. However, we need address only the Airport and Airway Development Act of 1970 (AADA) because we conclude section 30 of the Act authorizes the DOT to enact its MBE program. That section provides:
 
 
 87
 The Secretary shall take affirmative action to assure that no person shall, on the grounds of race, creed, color, national origin, or sex, be excluded from participating in any activity conducted with funds received from any grant made under this chapter. The Secretary shall promulgate such rules as the Secretary deems necessary to carry out the purposes of this section and may enforce this section, and any rules promulgated under this section, through agency and department provisions and rules which shall be similar to those established and in effect under Title VI of the Civil Rights Act of 1964.
 
 
 88
 49 U.S.C.App. Sec. 2219 (emphasis added).
 
 
 89
 For two reasons we believe the quoted passage may be fairly interpreted as a congressional delegation of the power to enact a program such as the MBE Program at issue here. First, the actual language of the statute indicates a broad delegation of power to the DOT to create regulations necessary to ensure there is no discrimination by recipients of federal funds under the AADA. Second, the statute endorses rules similar to those established under Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000d, and those rules condone, and in some cases require, race-conscious regulations and/or action. See 49 C.F.R. Sec. 21.5(b)(7).
 
 
 90
 Having decided that the DOT acted within the bounds of properly delegated congressional authority in creating the MBE regulations, we next must determine the proper standard by which to evaluate the constitutional validity of the DOT regulations. The district court relied on the plurality opinions in Wygant v. Jackson Board of Education, 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260, reh'g denied, 478 U.S. 1014, 106 S.Ct. 3320, 92 L.Ed.2d 728 (1986), and U.S. v. Paradise, 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), to conclude that the strict scrutiny standard "applies to racial classifications that operate against non-minorities." S.J. Groves & Sons Co., 696 F.Supp. at 1485 and n. 8. Our assessment of relevant case law tells us that the resolution of the proper standard to be applied to the DOT regulations is difficult. After wading through the morass of often conflicting majority, plurality and dissenting opinions that deal with race-conscious affirmative action programs issued by the members of the Supreme Court, we conclude that the district court, quite understandably, applied the incorrect standard.
 
 
 91
 In Fullilove, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Supreme Court reviewed the constitutionality of an MBE program contained in section 193(f)(2) of the Public Works Employment Act of 1977. The principal opinion in Fullilove, written by Chief Justice Burger, id. at 472, 100 S.Ct. at 2771, although stating that the program must be subject to "close examination," did not explicitly set out the applicable standard.[18] Instead, in upholding the constitutionality of the program the opinion noted the unique remedial authority of Congress under section five of the Fourteenth Amendment and the deference to which Congress is entitled when it acts pursuant to that provision, id. at 472 & 483, 100 S.Ct. at 2771 & 2777, the abundant evidence available to Congress of past discrimination in the construction industry, id. at 458-67, 100 S.Ct. at 2764-69, and the provision for waivers of the MBE requirements where no MBEs were available or where an MBE sought to unfairly take advantage of its position by charging exorbitant prices. Id. at 487-88, 100 S.Ct. at 2779-80.
 
 
 92
 A plurality of the Court in Wygant employed strict scrutiny in analyzing the constitutionality of a local school board's policy of extending preferential protection against lay-offs to minority employees. Wygant, 476 U.S. at 273-74, 106 S.Ct. at 1846-47. In Local 28 of Sheet Metal Workers' International Association v. EEOC, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986), the constitutionality of a court-ordered affirmative action program was at issue. A plurality of the Court noted that "[w]e have not agreed ... on the proper test to be applied in analyzing the constitutionality of race-conscious remedial measures.... We need not resolve the dispute here, since we conclude that the relief ordered in this case passes even the most rigorous test...." Local 28, 478 U.S. at 480, 106 S.Ct. at 3052. A plurality of the Court came to the same conclusion in Paradise, where the constitutionality of a court-ordered promotion scheme was at issue. "[A]lthough this Court has consistently held that some elevated level of scrutiny is required when a racial or ethnic distinction is made for remedial purposes, it has yet to reach consensus on the appropriate constitutional analysis. [ ] We need not do so in this case, however, because we conclude that the relief ordered survives even strict scrutiny analysis...." Paradise, 480 U.S. at 167, 107 S.Ct. at 1064. In short, at least until 1989, no five members of the Supreme Court had agreed (at least in the same case) upon the proper standard for reviewing affirmative action programs.[19]
 
 
 93
 In City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), a majority of the Court seemed to settle on a strict scrutiny standard for all government measures containing racial classifications. In Croson, the court held an MBE program developed by Richmond unconstitutional. Croson, 488 U.S. at 505, 109 S.Ct. at 727. Justice Scalia noted his agreement with the Court's conclusion that "strict scrutiny must be applied to all governmental classification by race, whether or not its asserted purpose is 'remedial' or 'benign.' " Id. at 520, 109 S.Ct. at 735 (Scalia, J., concurring). Several commentators agreed that a single standard had finally been settled on.[20]
 
 
 94
 If Croson were the Supreme Court's latest word on this question, we would probably agree that the district court, in applying the strict scrutiny standard to the DOT regulations, had proceeded correctly. However, Croson is not the Court's most recent treatment of affirmative action. On the final day of the Court's last Term, Metro Broadcasting, Inc. v. FCC, --- U.S. ----, 110 S.Ct. 2997, 111 L.Ed.2d 445 reh'g denied, --- U.S. ----, 111 S.Ct. 15, 111 L.Ed.2d 829, was decided. Although the issue is hardly free of doubt, our reading of Metro Broadcasting leads us to conclude that the Supreme Court would utilize an intermediate level of scrutiny in evaluating the DOT regulations. With the benefit of the opinion in Metro Broadcasting, which of course was decided after the district court issued its orders in this case, we conclude that the district court erred in subjecting the regulations to the more stringent strict scrutiny standard.
 
 
 95
 In Metro Broadcasting, the Court considered the question "whether certain minority preference policies of the Federal Communications Commission violate the equal protection component of the Fifth Amendment." Id. at ----, 110 S.Ct. at 3002. One of the challenged policies awards an enhancement for minority ownership and participation in management in evaluating applications for new broadcast licenses. Id. at ----, 110 S.Ct. at 3004-05. The second challenged policy allows distress sales to be resolved with a noncompetitive hearing, if the buyer is a minority enterprise. Id. at ----, 110 S.Ct. at 3005. The Court upheld both policies, applying intermediate scrutiny in doing so. Id. at ----, 110 S.Ct. at 3002. The Court held "that benign race-conscious measures mandated by Congress[ ]--even if those measures are not 'remedial' in the sense of being designed to compensate victims of past government or societal discrimination--are constitutionally permissible to the extent that they serve important governmental objectives within the power of Congress and are substantially related to achievement of those objectives." Id. at ----, 110 S.Ct. at 3008-09.
 
 
 96
 The majority opinion[21] made it clear that Croson "does not prescribe the level of scrutiny to be applied to a benign racial classification employed by Congress." Id. at ----, 110 S.Ct. at 3009. The opinion instead relied on Fullilove, asserting that a "majority of the Court in Fullilove did not apply strict scrutiny to the race-based classification at issue." Id. at ----, 110 S.Ct. at 3008. A clear demarcation between affirmative action programs developed by state and local governments and those developed at the direction of Congress was drawn. "It is of overriding significance in these cases that the FCC's minority ownership programs have been specifically approved--indeed mandated--by Congress." Id.
 
 
 97
 Therefore, it seems to us that the Court has created a dual inquiry for evaluating affirmative action programs. First, we must determine whether a state or local government has developed the program, or whether Congress has authorized the program's creation. If the former, a court must strictly scrutinize the program. That is, the means chosen must be narrowly tailored to achieve a compelling governmental interest. If the latter, however, then an intermediate level of scrutiny is appropriate. The program must serve an important governmental interest and the means must be substantially related to the achievement of that objective. Because Congress authorized the creation of the MBE program contained in the DOT regulations, the district court should have applied an intermediate level of scrutiny in evaluating the regulations. We will therefore remand the case for reconsideration in light of the appropriate standard. In the interest of judicial economy, however, we will address the County's other defenses.
 
 
 98
 b. Reliance
 
 
 99
 Fulton County's next defense is that it should not be held liable for violating the Equal Protection Clause when, in creating the 1982 MBE Program, it was only relying on presumptively valid federal regulations. The short answer to this defense is that the County is not being held liable for the violation of any federal right. Rather, its potential liability is based on violation of the Georgia low-bid statute. The question remains, however, whether Fulton County's reliance on what it believed were constitutional federal regulations is a defense in this suit.
 
 
 100
 We note initially that we have trouble allowing a local government to plead reliance on federal regulations when the local government voluntarily relied on those regulations. Fulton County argues as though the federal government forced it to apply for a grant under the AADA. Obviously, the County could have chosen other means to raise the funds to repair the Brown Field runway. On the other hand, the County argues that as far as it was aware, the AADA grant program and the accompanying DOT regulations that the County was required to comply with in order to qualify for the grant, were valid exercises of federal authority. Presumably then, the County's argument is actually that it has a right to rely on federal regulations (at least until they are declared invalid) to preempt conflicting state law.
 
 
 101
 The County's defense is foreclosed by the recent Supreme Court decision in American Trucking Ass'ns v. Smith, --- U.S. ----, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990). In that case, five justices rejected the notion that "the constitutionality vel non of [a statute or regulation] turns on whether state officials in a particular state could have anticipated that such a [statute or regulation] would violate the Constitution...." Id. at ----, 110 S.Ct. at 2345 (Stevens, J., dissenting).[22] As Justice Scalia explained,
 
 
 102
 To hold a governmental act to be unconstitutional is not to announce that we forbid it, but that the Constitution forbids it; and when, as in this case, the constitutionality of a state statute is placed in issue, the question is not whether some decision of ours "applies" in the way that a law applies; the question is whether the Constitution, as interpreted in that decision, invalidates the statute. Since the Constitution does not change from year to year; since it does not conform to our decisions, but our decisions are supposed to conform to it; the notion that our interpretation of the Constitution in a particular decision could take prospective form does not make sense.
 
 
 103
 Id. at ----, 110 S.Ct. at 2343 (Scalia, J., concurring in judgment) (emphasis in original).
 
 
 104
 Therefore, the DOT regulations if they indeed are unconstitutional, were unconstitutional when Fulton County relied on them. We are without power to declare them constitutional "in the interim," as the County urges. There is simply no authority on which to do so.
 
 
 105
 Additionally, we would have difficulty simply declaring the regulations unconstitutional, and then not applying that declaration even to the parties before the court. Such a decision would approach an advisory opinion, in violation of the Article III case or controversy requirement.[23]
 
 
 106
 c. Constitutional Estoppel
 
 
 107
 Fulton County's final defense[24] is that Groves is estopped from attacking the constitutionality of the DOT regulations. Under the doctrine of constitutional estoppel, one may not "retain the benefits of [a statute or regulation] while attacking the constitutionality of one of its provisions." U.S. v. San Francisco, 310 U.S. 16, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050 reh'g denied, 310 U.S. 657, 60 S.Ct. 1071, 84 L.Ed. 1420 (1940). The district court rejected this defense because Groves has received no benefits under the AADA, because it found Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), relied upon by the County, distinguishable and because the DOT regulations do not and are not designed to benefit non-MBE firms.
 
 
 108
 We agree with the district court. First, it is clear that the DOT regulations were not intended to benefit non-MBE firms; precisely the opposite is true--such firms are burdened by the regulations. Second, even if the regulations were intended to benefit Groves and similar bidders, there has been no showing that Groves ever received any contract under the AADA that was subject to the DOT regulations. The district court's order was limited to declaring subpart C of the regulations unconstitutional; it did not apply to subpart D, which relates to highway development. Consequently, any contracts bid on or performed that were subject to subpart D of the regulations are irrelevant to this case.
 
 
 109
 Fahey is not analogous. That case involved a shareholders' derivative suit in which a savings and loan association created under an act of Congress sought to challenge the constitutionality of that same act. The Supreme Court refused to hear the suit. "It would be difficult to imagine a more appropriate situation in which to apply the doctrine that one who utilizes an Act to gain advantages of corporate existence is estopped from questioning the validity of its vital conditions." Fahey, 332 U.S. at 256, 67 S.Ct. at 1557 (emphasis added). As the Supreme Court noted in response to an invocation of the doctrine of constitutional estoppel similar to the one we deal with here, "[a]ppellants obviously are not creatures of any statute, and we doubt that plaintiffs are generally forbidden to challenge a statute simply because they are deriving some benefit from it." Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 456-57, 108 S.Ct. 2481, 2486, 101 L.Ed.2d 399 (1988).
 
 
 110
 We conclude, therefore, that the district court correctly found that the reliance and constitutional estoppel defenses offered by Fulton County are not viable defenses in this case. As noted, however, we will remand the County's preemption argument to the district court for reevaluation.
 
 IV. CONCLUSION
 
 111
 We VACATE the district court's order and judgment granting relief on Counts VI through VIII and REMAND with instructions to dismiss the claims asserted in those counts for lack of standing. We VACATE the district court's judgment in favor of Groves on the remaining claims and REMAND for reconsideration of the County's preemption defense consistent with this opinion.
 
 
 
 [1]
 Minority Business Enterprise (MBE) is defined in slightly different ways, depending on the statute or program at issue. For purposes of this opinion, we will use the definition found at 49 C.F.R. Sec. 27.5:
 a small business concern ... which is owned and controlled by one or more minorities or women.
 
 
 [2]
 Jasper Construction Company is a wholly-owned subsidiary of Groves. Both are Minnesota corporations with their principal place of business in Minneapolis, Minnesota
 
 
 [3]
 "MBE participation" is defined by reference to the total dollar value of a bid in relation to the dollar value proposed to be sublet to MBEs
 
 
 [4]
 Counts VI, VII and VIII were originally facial attacks on Fulton County's 1979 MBE Resolution. The 1979 Resolution "called for a goal of twenty percent participation by [MBEs] in all county and procurement contracts." District Court Order, Sept. 30, 1985, R. 6-103-1. After the County replaced the 1979 Resolution with the 1984 MBE Resolution, Groves amended its complaint to reflect the change. Fulton County developed the 1982 program challenged in this appeal "solely to comply with the regulatory requirements[; the program is] not related in any way to the 1979 Resolution." Id. at 3
 
 
 [5]
 Jasper Construction Company is a plaintiff in Counts VI through VIII because of its alleged involvement in Fulton County construction work and the alleged injury to it caused by the 1984 MBE Resolution
 
 
 [6]
 Although the Fifth Amendment does not contain an equal protection clause, its due process clause incorporates the equal protection element prohibiting racial discrimination to the same extent as the equal protection clause contained in the Fourteenth Amendment prohibits such discrimination. Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976)
 
 
 [7]
 The delays in this case seem to have been caused primarily by extensive discovery and by the district court's prudent request for additional briefing on the effect of the Eleventh Circuit's opinion in H.K. Porter Co. v. Metropolitan Dade County, 825 F.2d 324 (11th Cir.1987), vacated, 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989), on this case. The district court decided Porter did not affect its disposition of the issues in this case. See District Court Order, Apr. 22, 1988, R. 3-188-6. The Supreme Court subsequently vacated our opinion in Porter. H.K. Porter Co. v. Metropolitan Dade County, 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989)
 
 
 [8]
 The DOT dismissed its appeal of this order after the Supreme Court rendered its decision in City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Therefore, Fulton County is the only appellant in this case
 
 
 [9]
 The court found it unnecessary to reach the Georgia constitutional question and denied summary judgment on Count III
 
 
 [10]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc ), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981
 
 
 [11]
 Groves also cites Associated General Contractors of California v. Secretary of Commerce, 441 F.Supp. 955 (C.D.Cal.1977), vacated, Los Angeles County v. Associated Gen. Contractors, 438 U.S. 909, 98 S.Ct. 3132, 57 L.Ed.2d 1153 (1978). There, the complaining contractors had not bid on any projects, but had at least identified specific projects they wished to bid on. Id. at 963. To the extent the cited case stands for the proposition that under circumstances similar to this case contractors need not bid on any project in order to show injury, we think the case was incorrectly decided
 
 
 [12]
 On May 17, 1979, DOT issued a Notice of Proposed Rule Making (NPRM) for the MBE regulation. 44 Fed.Reg. 28928. A final rule was issued March 31, 1980. 45 Fed.Reg. 21172. On March 3, 1981, DOT issued an NPRM to amend one provision of the MBE regulation. 46 Fed.Reg. 16282. The regulation was promulgated in its present form as a final rule on April 27, 1981. 46 Fed.Reg. 23457
 
 
 [13]
 The regulation does not define what constitutes "good faith efforts," but instead leaves the determination to the recipient. In Appendix A to subpart C of the regulation DOT provides a list meant to suggest the kinds of efforts recipients might consider
 
 
 [14]
 The County actually makes this argument in connection with its 1984 Resolution. Logically, however, the County is obliged to make the same argument with regard to the 1982 Program
 
 
 [15]
 Effective March 30, 1989, the word "responsible" was inserted after the word "lowest" in the first sentence
 
 
 [16]
 Fulton County is the only county that meets the size specifications of the new statute
 
 
 [17]
 We do not agree that, "like Tinker Bell, [federalism] must be close to expiring because no one believes in it anymore." The Third Death of Federalism, 3 Const'l Commentary 293, 294 (D. Bryden & D. Farber, eds.)
 
 
 [18]
 In analyzing fragmented Supreme Court opinions where no single decisional rationale has gained approval of the majority of the Court, lower federal courts should view the Court's holding " 'as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976)). Following this rule, the opinion written by Chief Justice Burger is the principal opinion in Fullilove
 
 
 [19]
 The variety of standards put forth by the various members of the Court is somewhat astonishing. See, e.g., Paradise, 480 U.S. at 187 n. 2, 107 S.Ct. at 1075 n. 2 (Powell, J., concurring) ("all government imposed affirmative action plans must be closely scrutinized"); id. at 197, 107 S.Ct. at 1080 (O'Connor, J., dissenting) (rejecting version of strict scrutiny applied by plurality because it "adopts a standardless view of 'narrowly tailored' far less stringent than that required by strict scrutiny."); Wygant, 476 U.S. at 274, 106 S.Ct. at 1847 (Powell, J., plurality opinion) (means chosen must be narrowly tailored to achieve a compelling governmental interest); id. at 284, 106 S.Ct. at 1852 (O'Connor, J., concurring) (same); id. at 301-02, 106 S.Ct. at 1861 (Marshall, J., dissenting) (remedial use of racial measures is permissible if it serves " 'important governmental objectives' " and is " 'substantially related to achievement of those objectives' " (quoting University of California Regents v. Bakke, 438 U.S. 265, 359, 98 S.Ct. 2733, 2783, 57 L.Ed.2d 750 (1978)); id. at 313, 106 S.Ct. at 1867 (Stevens, J., dissenting) (both public interest served by racial classification and means employed must justify adverse effects on the disadvantaged group); Fullilove, 448 U.S. at 507, 100 S.Ct. at 2789 (Powell, J., concurring) (review should not be strict in theory and fatal in fact); id. at 491, 100 S.Ct. at 2781 (Burger, J., principal opinion) ("Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees"); id. at 537, 100 S.Ct. at 2805 (Stevens, J., dissenting) ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification"); Bakke, 438 U.S. at 291, 98 S.Ct. at 2748 (1978) (Powell, J., joined by White, J.) ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination")
 This circuit has previously attempted to decipher these conflicting tests. See South Florida Chapter, 723 F.2d at 851 ("In light of the diversity of views on the Supreme Court, determining what 'test' will eventually emerge is highly speculative.").
 
 
 [20]
 See, e.g., Freeman, Antidiscrimination Law: The View from 1989, 64 Tul.L.Rev. 1407, 1432 (1990) ("remedial racial classifications are henceforth to be treated as 'suspect' and subjected to the same 'strict scrutiny' applied in racial discrimination cases."); Fried, Affirmative Action After City of Richmond v. J.A. Croson Co.: A Response to the Scholars' Statement, 99 Yale L.J. 155, 156 (1989) ("For the first time a majority of the Court holds unequivocally that all racial classifications ... must pass strict scrutiny and be justified by a compelling governmental purpose"); Rosenfeld, Decoding Richmond: Affirmative Action and the Meaning of Constitutional Equality, 87 Mich.L.Rev. 1729, 1731 (1989) ("a majority on the Court for the first time has settled on a single standard--the strict scrutiny test"); Sullivan, City of Richmond v. J.A. Croson Co.: The Backlash Against Affirmative Action, 64 Tul.L.Rev. 1609, 1611 (1990) ("the Court invalidated the Richmond plan under a standard of strict scrutiny upon which a majority coalesced."); see also Washington, Minority Set-Aside Programs After City of Richmond v. J.A. Croson Co., 19 Stetson L.Rev. 833, 841-42 (1990)
 
 
 [21]
 Justice Brennan wrote the majority opinion; he was joined by Justices White, Marshall, Blackmun and Stevens. Justice Stevens also filed a concurring opinion, but specifically joined both the opinion and judgment of the Court. See Metro Broadcasting, --- U.S. at ----, 110 S.Ct at 3028 (Stevens, J., concurring)
 
 
 [22]
 The four dissenters and Justice Scalia (concurring in the judgment) took this position
 
 
 [23]
 See U.S. Const., art. III, Sec. 2
 
 
 [24]
 Fulton County also requests that we create a qualified immunity against liability for violation of state law when a local government relies on federal regulations that have not yet been declared unconstitutional. The County cites no authority for the creation of this new form of qualified immunity, and we decline to create it out of thin air